UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil No. 3:22-cv-01753-JO-NLS |
| Plaintiff, | **CONSENT DECREE** |
| v. | |
| COUNTY OF SAN DIEGO, CALIFORNIA, | |
| Defendant. | |

1

# TABLE OF CONTENTS

I.      BACKGROUND..................................................................................................... 1
II.     JURISDICTION AND VENUE ............................................................................ 3
III.    PARTIES BOUND ................................................................................................ 3
IV.     DEFINITIONS...................................................................................................... 4
V.      OBJECTIVES ....................................................................................................... 7
VI.     PERFORMANCE OF THE WORK ..................................................................... 7
VII.    INDEMNIFICATION AND INSURANCE......................................................... 8
VIII.   PAYMENTS FOR RESPONSE COSTS ........................................................... 10
IX.     FORCE MAJEURE ............................................................................................ 12
X.      DISPUTE RESOLUTION ................................................................................. 13
XI.     STIPULATED PENALTIES ............................................................................. 16
XII.    COVENANTS BY PLAINTIFF ........................................................................ 18
XIII.   COVENANTS BY SETTLING DEFENDANT ................................................. 19
XIV.    EFFECT OF SETTLEMENT; CONTRIBUTION ............................................ 20
XV.     RECORDS.......................................................................................................... 21
XVI.    NOTICES AND SUBMISSIONS ...................................................................... 24
XVII.   APPENDIXES .................................................................................................... 25
XVIII.  MODIFICATIONS TO DECREE ...................................................................... 25
XIX.    SIGNATORIES .................................................................................................. 26
XX.     PRE-ENTRY PROVISIONS .............................................................................. 26
XXI.    INTEGRATION ................................................................................................. 26
XXII.   FINAL JUDGMENT .......................................................................................... 26

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

# I.    BACKGROUND

1.    The United States of America ("United States"), on behalf of the United States Department of Agriculture, Forest Service ("USDA/FS"), filed a complaint in this matter under sections 106, 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

2.    The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by USDA/FS for response actions at the Ramona Burn Dump Site, Cleveland National Forest, County of San Diego, California ("Site"), together with accrued interest; and (2) performance by Defendant, the County of San Diego, of a response action at the Site consistent with the National Contingency Plan, 40 C.F.R. part 300 ("NCP").

3.    In accordance with the NCP and section 121(f)(1)(F) of CERCLA, USDA/FS notified the State of California ("State") on November 2, 2021, of negotiations with potentially responsible parties ("PRPs") regarding the implementation of the response action for the Site, and USDA/FS has provided the State with an opportunity to participate in such negotiations and to be a party to this Consent Decree ("Decree").

4.    The Defendant that has entered into this Decree ("Settling Defendant") does not admit any liability arising out of the transactions or occurrences alleged in the complaint nor does it acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

5.    In response to a release or a substantial threat of a release of hazardous substances at or from the Site, USDA/FS completed a Preliminary Assessment/Site Inspection for the Site in May 2010, and an Engineering

1

Evaluation/Cost Analysis ("EE/CA") in January 2014, in accordance with 40 C.F.R. § 300.430.

6.      In accordance with section 117 of CERCLA and 40 C.F.R § 300.430(f), USDA/FS published notice of the completion of the EE/CA on January 13, 2014, in a major local newspaper of general circulation.  USDA/FS provided an opportunity for written and oral comments from the public on the proposed plan for response action.  The only comments received were from the County of San Diego, Solid Waste Local Enforcement Agency, which supported the selected remedy.  A copy of these comments and the EE/CA is available to the public as part of the Administrative Record, upon which the USDA/FS based the selection of the response action.

7.      USDA/FS selected a response action to be implemented at the Site, which is embodied in a Removal Action Memorandum ("Action Memorandum"), executed on August 17, 2017.

8.      On March 8, 2022, USDA/FS issued a unilateral administrative order requiring the County of San Diego ("County") to perform the response action authorized under the Action Memorandum, which was effective on March 15, 2022.

9.      Based on the information currently available, USDA/FS has determined that the Work (as defined in Section IV herein) will be properly and promptly conducted by Settling Defendant if conducted in accordance with this Decree.

10.      The Parties recognize, and the Court by entering this Decree finds, that this Decree has been negotiated by the Parties in good faith, that implementation of this Decree will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this Decree is fair, reasonable, in the public interest, and consistent with CERCLA.

CONSENT DECREE
3:22-cv-01753-JO-NLS

NOW, THEREFORE, it is hereby **ORDERED** and **DECREED** as follows:

## II.    JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1345, and sections 106, 107 and 113(b) of CERCLA, and personal jurisdiction over the Parties.  Venue lies in this District under section 113(b) of CERCLA and 28 U.S.C. §§ 1391(b), and 1395(a), because the Site is located in this judicial district.  This Court retains jurisdiction over the subject matter of this action and over the Parties for the purpose of resolving disputes arising under this Decree, entering orders modifying this Decree, or effectuating or enforcing compliance with this Decree.  Settling Defendant may not challenge the terms of this Decree or this Court's jurisdiction to enter and enforce this Decree.

## III.    PARTIES BOUND

12.    This Decree is binding upon the United States and upon Settling Defendant and its successors.  Unless the United States otherwise consents, (a) any change in legal status of Settling Defendant, including any transfer of assets, or (b) any Transfer of the Site or any portion thereof, does not alter any of Settling Defendant's obligations under this Decree.  Settling Defendant's responsibilities under this Decree cannot be assigned except under a modification executed in accordance with ¶ 61.

13.    In any action to enforce this Decree, Settling Defendant may not raise as a defense the failure of any of its officers, employees, agents, contractors, subcontractors, or any person representing Settling Defendant to take any action necessary to comply with this Decree.  Settling Defendant shall provide notice of this Decree to each person representing Settling Defendant with respect to the Site or the Work.  Settling Defendant shall provide notice of this Decree to each

3

contractor performing any Work and shall ensure that notice of the Decree is provided to each subcontractor performing any Work.

## IV.    DEFINITIONS

14.    Subject to the next sentence, terms used in this Decree that are defined in CERCLA or the regulations promulgated under CERCLA have the meanings assigned to them in CERCLA and the regulations promulgated under CERCLA. Whenever the terms set forth below are used in this Decree, the following definitions apply:

"Action Memorandum" means the USDA/FS decision document memorializing the selection of the response action for the Site.  The Action Memorandum is attached as Appendix A.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "Decree" means this consent decree and all appendixes attached hereto (listed in Section XVII).  If there is a conflict between a provision in Sections I through XXII and a provision in any appendix or deliverable, the provision in Sections I through XXII controls.

 "Day" or "day" means a calendar day.  In computing any period under this Decree, the day of the event that triggers the period is not counted and, where the last day is not a working day, the period runs until the close of business of the next working day.  "Working day" means any day other than a Saturday, Sunday, or federal or State holiday.

"DOJ" means the United States Department of Justice.

"Effective Date" means the date upon which the Court's approval of this Decree is recorded on its docket.

"Forest Service" means the United States Forest Service, an agency of the U.S. Department of Agriculture, and its successor departments, agencies, or instrumentalities.

4

"Fund" means the Hazardous Substance Superfund established under section 9507 of the Internal Revenue Code, 26 I.R.C. § 9507.

"Future Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States: (a) pays between December 15, 2022, and the Effective Date; and (b) pays after the Effective Date in implementing, overseeing, or enforcing this Decree, including: (i) in developing, reviewing and approving deliverables generated under this Decree; (ii) in overseeing Settling Defendant's performance of the Work; and (iii) in enforcing this Decree, including all costs paid under Section X (Dispute Resolution) and all litigation costs. Future Response Costs also includes all Interest accrued after December 15, 2022, on USDA/FS's unreimbursed costs (including Past Response Costs) under section 107(a) of CERCLA.

"Including" or "including" means "including but not limited to."

"Interest" means interest at the rate specified for interest on investments of the Fund, as provided under section 107(a) of CERCLA, compounded annually on October 1 of each year. The applicable rate of interest will be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. As of the date of lodging of this Decree, rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"National Contingency Plan" or "NCP" means the National Oil and Hazardous Substances Pollution Contingency Plan promulgated under section 105 of CERCLA, codified at 40 C.F.R. part 300, and any amendments thereto.

"Paragraph" or "¶" means a portion of this Decree identified by an Arabic numeral or an upper- or lower-case letter.

"Parties" means the United States and Settling Defendant.

"Past Response Costs" means all costs (including direct, indirect, payroll, contractor, travel, and laboratory costs) that the United States paid in connection with the Site through December 15, 2022, plus all

5

interest on such costs accrued under section 107(a) of CERCLA through such date.

"Plaintiff" means the United States.

"RCRA" means the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992k, (also known as the Resource Conservation and Recovery Act).

"Response Action" means the response action selected in the Action Memorandum.

"Section" means a portion of this Decree identified by a Roman numeral.

"Settling Defendant" means the County of San Diego, California.

"Site" means the Ramona Burn Dump Site, which is located north of the city of Ramona, California, within the Palomar Ranger District of the Cleveland National Forest, in the southeast quarter of the northeast quarter of Section 34 of Township 12 South, Range 1 East (San Bernardino Base Meridian) in San Diego County. The Site covers an area of approximately 3.5 acres. The Site also includes all real property to which hazardous substances have migrated.

"State" means the State of California.

"Statement of Work" or "SOW" means the document attached as Appendix B, which describes the activities Settling Defendant must perform to implement and maintain the effectiveness of the Response Action. The SOW is incorporated into this Decree and is an enforceable part of this Decree.

"Transfer" means to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" means the United States of America and each department, agency, and instrumentality of the United States, including USDA.

CONSENT DECREE
3:22-cv-01753-JO-NLS

"Waste Material" means (a) any "hazardous substance" under Section 101(14) of CERCLA; (b) any pollutant or contaminant under section 101(33) of CERCLA; and (c) any "solid waste" under section 1004(27) of RCRA.

"Work" means all obligations of Settling Defendant under Sections VI (Performance of the Work) through VII (Indemnification and Insurance).

## V.    OBJECTIVES

15.    The objectives of the Parties in entering into this Decree are to protect public health and welfare and the environment through the design, implementation, and maintenance of a response action at the Site by Settling Defendant, to pay response costs of Plaintiff, and to resolve and settle the claims of Plaintiff against Settling Defendant as provided in this Decree.

## VI.    PERFORMANCE OF THE WORK

16.    Settling Defendant shall finance, develop, implement, operate, maintain, and monitor the effectiveness of the Response Action all in accordance with this Decree, and the SOW, any USDA/FS-approved, conditionally approved, or modified deliverables as required by this Decree and the SOW.  Settling Defendant shall complete all actions required by Section 4.2 of the SOW no later than three years after the Effective Date or September 30 of the year following the calendar year when USDA/FS approves the Removal Action Work Plan required by Section 4.1 of the SOW, whichever is later.

17.    Modifications to the Response Action and Further Response Actions. Nothing in this Decree limits USDA/FS's authority to modify the Response Action or to select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.  Nothing in this Decree limits Settling Defendant's rights, under sections 113(k)(2) or 117 of CERCLA, to comment on any modified or further response actions proposed by USDA/FS.

CONSENT DECREE
3:22-cv-01753-JO-NLS

18.  **Compliance with Applicable Law**.  Nothing in this Decree affects Settling Defendant's obligations to comply with all applicable federal and state laws and regulations.  Settling Defendant must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the Action Memorandum and the SOW.  The activities conducted in accordance with this Decree, if approved by USDA/FS, will be deemed to be consistent with the NCP as provided under section 300.700(c)(3)(ii).

## VII.  INDEMNIFICATION AND INSURANCE

19.  **Indemnification**

a.    Plaintiff does not assume any liability by entering into this Decree or by virtue of any designation of Settling Defendant as USDA/FS's authorized representative under section 104(e)(1) of CERCLA.  Settling Defendant shall indemnify and save and hold harmless Plaintiff and its officials, agents, employees, contractors, subcontractors, and representatives for or from any claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of Settling Defendant, its officers, employees, agents, contractors, subcontractors, and any persons acting on Settling Defendant's behalf or under its control, in carrying out activities under this Decree, including any claims arising from any designation of Settling Defendant as USDA/FS's authorized representative under section 104(e)(1) of CERCLA.  Further, Settling Defendant agrees to pay Plaintiff all costs it incurs including attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against Plaintiff based on negligent or other wrongful acts or omissions of Settling Defendant, its officers, employees, agents, contractors, subcontractors, and any persons acting on its behalf or under its control in carrying out activities under this Decree.  Plaintiff may not be held out as a party to any contract entered into by or on behalf of Settling Defendant in carrying out activities under this Decree.

8

Settling Defendant and any such contractor may not be considered an agent of Plaintiff.

b.     Plaintiff shall give Settling Defendant notice of any claim for which Plaintiff plans to seek indemnification in accordance with this Paragraph, and shall consult with Settling Defendant prior to settling such claim.

20.     Settling Defendant covenants not to sue and shall not assert any claim or cause of action against Plaintiff for damages or reimbursement or for set-off of any payments made or to be made to Plaintiff, arising from or on account of any contract, agreement, or arrangement between Settling Defendant and any person for performance of Work or other activities on or relating to the Site, including claims on account of construction delays.  In addition, Settling Defendant shall indemnify and save and hold Plaintiff harmless with respect to any claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between Settling Defendant and any person for performance of work at or relating to the Site, including claims on account of construction delays.

21.     **Insurance**.  Settling Defendant shall secure, by no later than 15 days before commencing any on-site Work, the following insurance:  (a) commercial general liability insurance with limits of liability of $1 million per occurrence; (b) automobile liability insurance with limits of liability of $1 million per accident; and (c) umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits.  In place of obtaining the foregoing commercially available insurance coverage, Settling Defendant may provide proof of its program of self-insurance with at least the same coverage as required by a commercially obtained insurance policy.  The insurance policy must name Plaintiff as an additional insured with respect to all liability arising out of the activities performed by or on behalf of Settling Defendant under this Decree.  Settling Defendant shall maintain this insurance

9

until the first anniversary after issuance of USDA/FS's Notice of Completion of Work under Section 4.3(c) of the SOW.  In addition, for the duration of this Decree, Settling Defendant shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Settling Defendant in furtherance of this Decree.  Prior to commencement of the Work, Settling Defendant shall provide to USDA/FS certificates of such insurance and a copy of each insurance policy or statement of coverage of self-insurance. Settling Defendant shall resubmit such certificates and copies of policies or statements each year on the anniversary of the Effective Date.  If Settling Defendant demonstrates by evidence satisfactory to USDA/FS that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Settling Defendant need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.  Settling Defendant shall ensure that all submittals to USDA/FS under this Paragraph identify the Ramona Burn Dump Site and the civil action number of this case.

## VIII.  PAYMENTS FOR RESPONSE COSTS

22.    **Payment for Past Response Costs**.  Within 30 days after the Effective Date, Settling Defendant shall pay USDA/FS, in reimbursement of Past Response Costs in connection with the Site, $398,091.92.  The Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Southern District of California shall send Settling Defendant instructions for making the payment of Past Response Costs, including a Consolidated Debt Collection System ("CDCS") reference number. Settling Defendant shall make such payment at https://www.pay.gov in accordance with the FLU's instructions, including

CONSENT DECREE
3:22-cv-01753-JO-NLS

references to the CDCS Number. Settling Defendant shall send notices of this payment to DOJ and USDA/FS.  If the payment required under this Paragraph is late, Settling Defendant shall pay, in addition to any stipulated penalties owed under Section XI, an additional amount for Interest accrued from the Effective Date until the date of payment.

23. **Payments by Settling Defendant for Future Response Costs**

a. **Periodic Bills**.  On a periodic basis, USDA/FS will send Settling Defendant a bill for Future Response Costs, including a standard cost summary listing direct and indirect costs paid by USDA/FS, its contractors, subcontractors, and DOJ.  Settling Defendant may initiate a dispute under Section X regarding a Future Response Cost billing, but only if the dispute relates to one or more of the following issues:  (i) whether USDA/FS has made an arithmetical error; (ii) whether USDA/FS has included a cost item that is not within the definition of Future Response Costs; or (iii) whether USDA/FS has paid excess costs as a direct result of an USDA/FS action that was inconsistent with a specific provision or provisions of the NCP.  Settling Defendant must specify in the Notice of Dispute the contested costs and the basis for the objection.

b. **Payment of Bill**.  Settling Defendant shall pay the bill, or if it initiates dispute resolution, the uncontested portion of the bill, if any, within 30 days after receipt of the bill.  Settling Defendant shall pay the contested portion of the bill determined to be owed, if any, within 30 days after the determination regarding the dispute.  Each payment for:  (i) the uncontested bill or portion of bill, if late, and; (ii) the contested portion of the bill determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the bill through the date of payment.  Settling Defendant shall make payment in accordance with the Bill for Collection issued by USDA/FS.  Settling Defendant shall send notices of this payment to DOJ and USDA/FS.

11

# IX.    FORCE MAJEURE

24.    "Force majeure," for purposes of this Decree, means any event arising from causes beyond the control of Settling Defendant, of any entity controlled by Settling Defendant, or of Settling Defendant's contractors that delays or prevents the performance of any obligation under this Decree despite Settling Defendant's best efforts to fulfill the obligation.  Given the need to protect public health and welfare and the environment, the requirement that Settling Defendant exercises "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible.  "Force majeure" does not include financial inability to complete the Work.

25.    If any event occurs for which Settling Defendant will or may claim a force majeure, Settling Defendant shall notify USDA/FS's Project Coordinator by email.  The deadline for the initial notice is three (3) days after the date Settling Defendant first knew or should have known that the event would likely delay performance.  Settling Defendant shall be deemed to know of any circumstance of which any contractor of, subcontractor of, or entity controlled by Settling Defendant knew or should have known.  Within seven (7) days thereafter, Settling Defendant shall send a further notice to USDA/FS that includes:  (i) a description of the event and its effect on Settling Defendant's completion of the requirements of the Decree; (ii) a description of all actions taken or to be taken to prevent or minimize the adverse effects or delay; (iii) the proposed extension of time for Settling Defendant to complete the requirements of the Decree; (iv) a statement as to whether, in the opinion of Settling Defendant, such event may cause or contribute to an endangerment to public health or welfare, or the environment; and

12

(v) all available proof supporting their claim of force majeure.  Failure to comply with the notice requirements herein regarding an event precludes Settling Defendant from asserting any claim of force majeure regarding that event, provided, however, that if USDA/FS, despite late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 24 and whether Settling Defendant has exercised its best efforts under ¶ 24, USDA/FS may, in its unreviewable discretion, excuse in writing Settling Defendant's failure to submit timely or complete notices under this Paragraph.

26.    USDA/FS will notify Settling Defendant of its determination whether Settling Defendant is entitled to relief under ¶ 24, and, if so, the duration of the extension of time for performance of the obligations affected by the force majeure. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation.  Settling Defendant may initiate dispute resolution under Section X regarding USDA/FS's determination within 15 days after receipt of the determination.  In any such proceeding, Settling Defendant has the burden of proving that it is entitled to relief under ¶ 24 and that their proposed extension was or will be warranted under the circumstances.

27.    The failure by USDA/FS to timely complete any activity under the Decree or the SOW is not a violation of the Decree, provided, however, that if such failure prevents Settling Defendant from timely completing a requirement of the Decree, Settling Defendant may seek relief under this Section.

## X.    DISPUTE RESOLUTION

28.    Unless otherwise provided in this Decree, Settling Defendant must use the dispute resolution procedures of this Section to resolve any dispute arising under this Decree.  Settling Defendant shall not initiate a dispute challenging the

13

CONSENT DECREE
3:22-cv-01753-JO-NLS

Action Memorandum.  The United States may enforce any requirement of the Decree that is not the subject of a pending dispute under this Section.

29.    A dispute will be considered to have arisen when one or both of the parties sends a written notice of dispute ("Notice of Dispute").  Disputes arising under this Decree must in the first instance be the subject of informal negotiations between the Parties to the dispute.  The period for informal negotiations may not exceed 20 days after the dispute arises, unless the Parties to the dispute otherwise agree.  If the Parties cannot resolve the dispute by informal negotiations, the position advanced by USDA/FS is binding unless Settling Defendant initiates formal dispute resolution under ¶ 30.  By agreement of the Parties, mediation may be used during this informal negotiation period to assist the Parties in reaching a voluntary resolution or narrowing of the matters in dispute.

30.    **Formal Dispute Resolution**

a.  **Statements of Position**.  Settling Defendant may initiate formal dispute resolution by serving on the Plaintiff, within 20 days after the conclusion of informal dispute resolution under ¶ 29, an initial Statement of Position regarding the matter in dispute.  The Plaintiff's responsive Statement of Position is due within 20 days after receipt of the initial Statement of Position.  All Statements of Position must include supporting factual data, analysis, opinion, and other documentation.  A reply, if any, is due within 10 days after receipt of the response. If appropriate, USDA/FS may extend the deadlines for filing statements of position for up to 45 days and may allow the submission of supplemental statements of position.

b.  **Formal Decision**.  The Regional Forester, USDA/FS Region 5, will issue a formal decision resolving the dispute ("Formal Decision") based on the statements of position and any replies and supplemental statements of position.

14

CONSENT DECREE
3:22-cv-01753-JO-NLS

The Formal Decision is binding on Settling Defendant unless it timely seeks judicial review under ¶ 31.

         c.  **Compilation of Administrative Record**.  USDA/FS shall compile an administrative record regarding the dispute, which must include all statements of position, replies, supplemental statements of position, and the Formal Decision.

      31.  **Judicial Review**

         a.  Settling Defendant may obtain judicial review of the Formal Decision by filing, within 20 days after receiving it, a motion with the Court and serving the motion on all Parties.  The motion must describe the matter in dispute and the relief requested.  The Parties to the dispute shall brief the matter in accordance with local court rules.

         b.  **Review on the Administrative Record**.  Judicial review of disputes regarding the following issues must be on the administrative record: (i) the adequacy or appropriateness of deliverables required under the Decree; (ii) the adequacy of the performance of the Response Action; (iii) USDA/FS's selection of modified or further response actions; (iv) any other items requiring USDA/FS approval under the Decree; and (v) any other disputes that the Court determines should be reviewed on the administrative record.  For all of these disputes, Settling Defendant bears the burden of demonstrating that the Formal Decision was arbitrary and capricious or otherwise not in accordance with law.

         c.  Judicial review of any dispute not governed by ¶ 31.b shall be governed by applicable principles of law.

      32.  **Escrow Account**.  For disputes regarding a Future Response Cost billing, Settling Defendant shall:  (a) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC); (b) remit to that escrow account funds equal to the amount of the contested Future Response Costs; and (c) send to USDA/FS copies

CONSENT DECREE
3:22-cv-01753-JO-NLS

of the correspondence and of the payment documentation (*e.g.*, the check) that established and funded the escrow account, including the name of the bank, the bank account number, and a bank statement showing the initial balance in the account.  USDA/FS may, in its unreviewable discretion, waive the requirement to establish the escrow account.  Settling Defendant shall cause the escrow agent to pay the amounts due to USDA/FS under ¶ 23, if any, by the deadline for such payment in ¶ 23.  Settling Defendant is responsible for any balance due under ¶ 23 after the payment by the escrow agent.

33.    The initiation of dispute resolution procedures under this Section does not extend, postpone, or affect in any way any requirement of this Decree, except as USDA/FS agrees, or as determined by the Court.  Stipulated penalties with respect to the disputed matter will continue to accrue, but payment is stayed pending resolution of the dispute, as provided in ¶ 35.

## XI.    STIPULATED PENALTIES

34.    Unless the noncompliance is excused under Section IX (Force Majeure), Settling Defendant is liable to the United States for the following stipulated penalties:

a.  for any failure: (i) to pay any amount due under Section VIII; (ii) to submit timely or adequate deliverables under the SOW; (iii) to complete the Removal Action as required by Paragraph 16 of this Consent Decree and Section 4.2 of the SOW; and (iv) any other timely or adequate deliverables required by this Decree:

| Period of Noncompliance | Penalty Per Noncompliance Per Day |
|---|---|
| 1st through 14th day | $250 |
| 15th through 30th day | $750 |
| 31st day and beyond | $1250 |

16

35.    **Accrual of Penalties**.  Stipulated penalties accrue from the date performance is due, or the day a noncompliance occurs, whichever is applicable, until the date the requirement is completed or the final day of the correction of the noncompliance.  Nothing in this Decree prevents the simultaneous accrual of separate penalties for separate noncompliances with this Decree.  Stipulated penalties accrue regardless of whether Settling Defendant has been notified of its noncompliance, and regardless of whether Settling Defendant has initiated dispute resolution under Section X, provided, however, that no penalties will accrue as follows:

a.  with respect to a submission that USDA/FS subsequently determines is deficient under the SOW, during the period, if any, beginning on the 31st day after USDA/FS's receipt of such submission until the date that USDA/FS notifies Settling Defendant of any deficiency;

b.  with respect to a matter that is the subject of dispute resolution under Section X, during the period, if any, beginning on the 21st day after the later of the date that USDA/FS's Statement of Position is received or the date that Settling Defendant's reply thereto (if any) is received until the date of the Formal Decision under ¶ 30.b; or

c.  with respect to a matter that is the subject of judicial review by the Court under ¶ 31, during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute.

36.    **Demand and Payment of Stipulated Penalties**.  USDA/FS may send Settling Defendant a demand for stipulated penalties.  The demand will include a description of the noncompliance and will specify the amount of the stipulated penalties owed.  Settling Defendant may initiate dispute resolution under Section X within 30 days after receipt of the demand.  Settling Defendant shall pay the

17

amount demanded or, if it initiates dispute resolution, the uncontested portion of the amount demanded, within 30 days after receipt of the demand.  Settling Defendant shall pay the contested portion of the penalties determined to be owed, if any, within 30 days after the resolution of the dispute.  Each payment for:  (a) the uncontested penalty demand or uncontested portion, if late; and (b) the contested portion of the penalty demand determined to be owed, if any, must include an additional amount for Interest accrued from the date of receipt of the demand through the date of payment.  Settling Defendant shall make payment in accordance with the Bill for Collection issued by USDA/FS.

37.    Settling Defendant shall send a notice of this payment to DOJ and USDA/FS.  The payment of stipulated penalties and Interest, if any, does not alter any obligation by Settling Defendant under the Decree.

38.    Nothing in this Decree limits the authority of the United States:  (a) to seek any remedy otherwise provided by law for Settling Defendant's failure to pay stipulated penalties or interest; or (b) to seek any other remedies or sanctions available by virtue of Settling Defendant's noncompliances with this Decree or of the statutes and regulations upon which it is based, including penalties under section 122(*l*) of CERCLA, provided, however, that the United States may not seek civil penalties under section 122(*l*) of CERCLA for any noncompliance for which a stipulated penalty is provided for in this Decree, except in the case of a willful noncompliance with this Decree.

39.    Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued under this Decree.

## XII.   COVENANTS BY PLAINTIFF

40.    **Covenants for Settling Defendant**.  Subject to ¶¶ 42 and 43, the United States covenants not to sue or to take administrative action against Settling

18

CONSENT DECREE
3:22-cv-01753-JO-NLS

Defendant under sections 106 and 107(a) of CERCLA regarding the Work, Past Response Costs, and Future Response Costs.

41.    The covenants under ¶ 40:  (a) take effect upon the Effective Date; (b) are conditioned on the satisfactory performance by Settling Defendant of the requirements of this Decree; (c) extend to the successors of Settling Defendant but only to the extent that the alleged liability of the successor of Settling Defendant is based solely on its status as a successor of Settling Defendant; and (d) do not extend to any other person.

42.    **General Reservations**.  Notwithstanding any other provision of this Decree, the United States reserves, and this Decree is without prejudice to, all rights against Settling Defendant regarding the following:

a.  liability for failure by Settling Defendant to meet a requirement of this Decree;

b.  liability for performance of response action other than the Work;

c.  liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site; and

d.  criminal liability.

43.    Subject to ¶ 40 nothing in this Decree limits any authority of Plaintiff to take, direct, or order all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or to request a Court to order such action.

### XIII.  COVENANTS BY SETTLING DEFENDANT

44.    **Covenants by Settling Defendant**

a.  Subject to ¶ 45, Settling Defendant covenants not to sue and shall not assert any claim or cause of action against the United States under CERCLA, section 7002(a) of RCRA, the United States Constitution, the Tucker Act,

19

CONSENT DECREE
3:22-cv-01753-JO-NLS

28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, the State Constitution, State law, or at common law regarding the Site.

       b.  Subject to ¶ 45, Settling Defendant covenants not to seek reimbursement from the Fund through CERCLA or any other law for costs regarding the Site.

45.    **Settling Defendant's Reservation**.  The covenants in ¶ 44 do not apply to any claim or cause of action brought, or order issued, after the Effective Date by the United States to the extent such claim, cause of action, or order is within the scope of a reservation under ¶¶ 42.a through 42.d.

46.    Nothing in this Consent Decree is intended to limit Settling Defendant's potential for insurance coverage.

## XIV.  EFFECT OF SETTLEMENT; CONTRIBUTION

47.    The Parties agree and the Court finds that:  (a) the complaint filed by the United States in this action is a civil action within the meaning of section 113(f)(1) of CERCLA; (b) this Decree constitutes a judicially approved settlement under which Settling Defendant has, as of the Effective Date, resolved its liability to the United States within the meaning of sections 113(f)(2) and 113(f)(3)(B) of CERCLA; and (c) Settling Defendant is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this Decree.  The "matters addressed" in this Decree are the Work, and the Past Response Costs and Future Response Costs, provided, however, that if the United States exercises rights under the reservations in ¶¶ 42.a through 42.d, the "matters addressed" in this Decree will no longer include those response costs or response actions or natural resource damages that are within the scope of the exercised reservation.

CONSENT DECREE
3:22-cv-01753-JO-NLS

48.    Settling Defendant shall, with respect to any suit or claim brought by it for matters related to this Decree, notify DOJ and USDA/FS no later than 60 days prior to the initiation of such suit or claim.  Settling Defendant shall, with respect to any suit or claim brought against it for matters related to this Decree, notify DOJ and USDA/FS within 10 days after service of the complaint on Settling Defendant.  In addition, Settling Defendant shall notify DOJ and USDA/FS within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

49.    **Res Judicata and Other Defenses**.  In any subsequent administrative or judicial proceeding initiated against Settling Defendant by Plaintiff for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, Settling Defendant shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, claim preclusion (res judicata), issue preclusion (collateral estoppel), claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case.

50.    Nothing in this Decree diminishes the right of the United States under section 113(f)(2) and (3) of CERCLA to pursue any person not a party to this Decree to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to section 113(f)(2).

51.    This Consent Decree does not limit or affect the rights of Settling Defendant against any third parties not party to this Consent Decree.

## XV.   RECORDS

52.    **Settling Defendant Certification**.  Settling Defendant certifies that: (a) it has implemented a litigation hold on documents and electronically stored information relating to the Site, including information relating to its potential liability under CERCLA regarding the Site, since the earlier of notification of

CONSENT DECREE
3:22-cv-01753-JO-NLS

potential liability by the United States or the State or the filing of suit against it regarding the Site; and (b) it has fully complied with any and all USDA/FS requests for information under sections 104(e) and 122(e) of CERCLA, and section 3007 of RCRA.

53.    **Retention of Records and Information**

a.  Settling Defendant shall retain, and instruct its contractors and agents to retain, the following documents and electronically stored data (Records) until 10 years after the Notice of Completion of the Work (the "Record Retention Period"):

(1)    All records regarding Settling Defendant's liability under CERCLA regarding the Site;

(2)    All reports, plans, permits, and documents submitted to USDA/FS in accordance with this Decree, including all underlying research and data; and

(3)    All data developed by, or on behalf of, Settling Defendant in the course of performing the Response Action.

b.    Settling Defendant shall retain all Records regarding the liability of any person under CERCLA regarding the Site during the Record Retention Period.

c.    At the end of the Record Retention Period, Settling Defendant shall notify USDA/FS that it has 90 days to request the Settling Defendant's Records subject to this Section.  Settling Defendant shall retain and preserve its Records subject to this Section until 90 days after USDA/FS's receipt of the notice. These record retention requirements apply regardless of any corporate record retention policy.

54.    Settling Defendant shall provide to USDA, upon request, copies of all Records and information required to be retained under this Section.  Settling

CONSENT DECREE
3:22-cv-01753-JO-NLS

Defendant shall also make available to USDA, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

55.    **Privileged and Protected Claims**

a.    Settling Defendant may assert that all or part of a record requested by Plaintiff is privileged or protected as provided under federal law, in lieu of providing the record, provided that Settling Defendant complies with ¶ 55.b, and except as provided in ¶ 55.c.

b.    If Settling Defendant asserts a claim of privilege or protection, it shall provide Plaintiff with the following information regarding such record: its title; its date; the name, title, affiliation (*e.g.*, company or firm), and address of the author, of each addressee, and of each recipient; a description of the record's contents; and the privilege or protection asserted.  If a claim of privilege or protection applies only to a portion of a record, Settling Defendant shall provide the record to Plaintiff in redacted form to mask the privileged or protected portion only.  Settling Defendant shall retain all records that they claim to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in Settling Defendant's favor.

c.    Settling Defendant shall not make any claim of privilege or protection regarding:  1) any data regarding the Site, including all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other record that evidences conditions at or around the Site; or (2) the portion of any record that Settling Defendant is required to create or generate in accordance with this Decree.

56.    **Confidential Business Information ("CBI") Claims**.  Settling Defendant may claim that all or part of a record provided to Plaintiff under this

23

CONSENT DECREE
3:22-cv-01753-JO-NLS

Section is CBI to the extent permitted by and in accordance with section 104(e)(7) of CERCLA and 40 C.F.R. § 2.203(b). Settling Defendant shall segregate and shall clearly identify all records or parts thereof submitted under this Decree for which they claim is CBI by labeling each page or each electronic file "claimed as confidential business information" or "claimed as CBI." Records that Settling Defendant claims to be CBI will be afforded the protection specified in 40 C.F.R. part 2, subpart B. If no CBI claim accompanies records when they are submitted to USDA, or if USDA/FS notifies Settling Defendant that the records are not entitled to confidential treatment under the standards of section 104(e)(7) of CERCLA or 40 C.F.R. part 2, subpart B, the public may be given access to such records without further notice to Settling Defendant.

57.    In any proceeding under this Decree, validated sampling or monitoring data generated in accordance with the Decree and reviewed and approved by USDA/FS, if relevant to the proceeding, is admissible as evidence, without objection.

58.    Notwithstanding any provision of this Decree, Plaintiff retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XVI.  NOTICES AND SUBMISSIONS

59.    All agreements, approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, waivers, and requests specified in this Decree must be in writing unless otherwise specified. Whenever a notice is required to be given or a report or other document is required to be sent by one Party to another under this Decree, it must be sent as specified below. All notices under this Section are effective upon receipt, unless otherwise specified. In the case of emailed notices, there is a rebuttable presumption that such notices are

24

received on the same day that they are sent.  Any Party may change the method, person, or address applicable to it by providing notice of such change to all Parties.

|  | As to DOJ: | *via email to*: eescdcopy.enrd@usdoj.gov Re: DJ # 90-11-3-11691 |
|---|---|---|

|  | As to USDA/FS *On-Scene Coordinator*: | *via email to*: Noelle K. Graham-Wakoski noelle.graham@usda.gov Re:  Ramona Burn Dump Site |
|---|---|---|

|  | As to Settling Defendant *Director of Public Works*: | *via email to*: Derek Gade derek.gade@sdcounty.ca.gov Re: Ramona Burn Dump Site |
|---|---|---|

|  | With a Copy to County Counsel | *via email to*: COSD.Claims@sdcounty.ca.gov Re: Ramona Burn Dump Site File No. 14-90389 |
|---|---|---|

## XVII. APPENDIXES

60.    The following appendixes are attached to and incorporated into this Decree:

"Appendix A" is the Action Memorandum.

"Appendix B" is the SOW.

## XVIII.    MODIFICATIONS TO DECREE

61.    Except as provided in ¶ 17 and in Section 3.3 of the SOW, nonmaterial modifications to Sections I through XXII and the Appendixes must be in writing and are effective when signed (including electronically signed) by the Parties.  Material modifications to Sections I through XXII and the Appendixes

25

CONSENT DECREE
3:22-cv-01753-JO-NLS

must be in writing, signed (which may include electronically signed) by the Parties, and are effective upon approval by the Court.

## XIX.  SIGNATORIES

62.    The undersigned representative of the United States and the undersigned representative of Settling Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such Party to this document.

## XX.   PRE-ENTRY PROVISIONS

63.    If for any reason the Court should decline to approve this Decree in the form presented, this agreement, except for ¶ 64 and ¶ 65, is voidable at the sole discretion of any Party and its terms may not be used as evidence in any litigation between the Parties.

64.    This Decree will be lodged with the Court for at least 30 days for public notice and comment in accordance with section 122(d)(2) of CERCLA and 28 C.F.R. § 50.7.  The United States may withdraw or withhold its consent if the comments regarding the Decree disclose facts or considerations that indicate that the Decree is inappropriate, improper, or inadequate.

65.    Settling Defendant agrees to not oppose or appeal the entry of this Decree.

## XXI.  INTEGRATION

66.    This Decree constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements, and understandings, whether oral or written, regarding the subject matter of the Decree.

## XXII. FINAL JUDGMENT

67.    Upon entry of this Decree by the Court, this Decree constitutes a final judgment under Fed. R. Civ. P. 54 and 58 between the Parties.

CONSENT DECREE
3:22-cv-01753-JO-NLS

1    **SO ORDERED** this 5th day of June, 2023.

2

3

4                                                United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENT DECREE
3:22-cv-01753-JO-NLS

Signature Page for Consent Decree in *U.S. v. County of San Diego*

**FOR THE UNITED STATES:**

April 7, 2023          Todd Kim
Dated                    Assistant Attorney General
                         U.S. Department of Justice
                         Environment and Natural Resources
                         Division

                            /s/ Andrew W. Ingersoll
                         Andrew W. Ingersoll
                         Trial Attorney
                         Environmental Enforcement Section

28

CONSENT DECREE
3:22-cv-01753-JO-NLS

Signature Page for Consent Decree in *U.S. v. County of San Diego*

**FOR COUNTY OF SAN DIEGO:**

<u>March 1, 2023</u>          <u>/s/ Joshua M. Heinlein</u>
Dated                        CLAUDIA G. SILVA, County
                             Counsel
                             By: JOSHUA M. HEINLEIN, Senior
                             Deputy
                             Attorneys for Defendant COUNTY
                             OF SAN DIEGO

29

CONSENT DECREE
3:22-cv-01753-JO-NLS

*United States v. County of San Diego* - Case 3:22-cv-01753-JO-NLS

**Consent Decree Appendix A**

# August 17, 2017 Forest Service Action Memo

# REMOVAL ACTION MEMORANDUM
## NON-TIME-CRITICAL REMOVAL ACTION
## RAMONA BURN DUMP SITE
## CLEVELAND NATIONAL FOREST

## I.     PURPOSE

The Ramona Burn Dump Site ("Site") is a 3.5 acre former solid waste disposal site located on National Forest System lands under the jurisdiction, custody, and control of the U.S. Department of Agriculture, Forest Service ("Forest Service"). The Site is located within the Cleveland National Forest, Palomar Ranger District, San Diego County, California, Assessor Parcel Number (APN) 244-100-17. Figure No 1 shows the general vicinity of the Site and Figure No. 2 shows the site features.

The purpose of this Removal Action Memorandum (AM) is to document the selection of a non-time-critical removal action to address presence of and continued release of heavy metals (antimony, arsenic, barium, cadmium, chromium, cobalt, copper, lead, nickel, selenium, and zinc), dioxins, and furans in soils at the Site. The situation at the Ramona Burn Dump Site (Site) meets the criteria for a non-time-critical removal action under Section 300.415 of the National Oil and Hazardous Substances Pollution Contingency Plan (NCP).

This decision document (Removal Action Memorandum) presents the Forest Service's selected removal response action for the Site, chosen in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (CERCLA), 42 U.S.C. 9601 et seq., and, to the extent practicable, the NCP. The AM is based upon the administrative record for the Site.

This non-time-critical removal action involves no nationally significant or precedent setting issues. This removal action will not establish any precedent for how future response actions will be taken and will not commit the Forest Service to a course of action that could have a significant impact on future responses or resources.

## II.     SITE CONDITIONS AND BACKGROUND

### A. Site Location

The Site is located in San Diego County, in the Palomar Ranger District of the Cleveland National Forest, California. It is in the southeast quarter of the northeast quarter of Section 34, Township 12 south, Range 1 east, San Bernardino Base Meridian, within Assessor Parcel Number 244-100-17. The Site is on National Forest System lands in Wildcat Canyon, Pamo Valley, approximately 4 miles north of the city of Ramona, California. Ramona's population was 20,292 in 2010 (U.S. Census Bureau, 2013). The Site is accessible by two-wheel drive vehicles and is adjacent to Dump Road, a paved private road that provides access to the currently closed Ramona Landfill, which is managed by Ramona Landfill Inc., a subsidary of Allied Waste Industries (Allied Waste).

## B.  Site Characteristics

The Site is located at an average elevation of 1,600 feet above mean sea level and covers an area of approximately 3.5 acres. The Site is separated from Dump Road by a 4-foot-tall wire fence, which limits public access. An unpaved acess road allows vehicles and pedestrians to access the Site from Dump Road. A locked gate at the main entrance to the Ramona Landfill separates Dump Road from Pamo Road. The area immediately surrounding the Ramona Burn Dump Site is zoned as open space or agricultural under the County's Multiple Species Conservation Program. (County, 2010). Recreational hikers or Forest Service personnel walking the site are the likely potential future users of the Site (Forest Service, 2013).

The Site is located in coastal southern California with warm, dry summers and mild winters. Total average precipitation is about 16.5 inches. The Site is not located within a mapped floodplain (ERRG, 2010). The Site is located within the San Dieguito Watershed (Water Board Hydrogeologic Unit Basin Area 5.41) (Water Board, 2011) in close proximity to and upstream of Santa Ysabel Creek and Lake Hodges and downstream of Sutherland Reservoir. The Site is flanked by two natural drainages that merge east of the Site. Downstream of the Site the drainage becomes an unnamed ephemeral creek that joins Santa Ysabel Creek within 0.5 miles of the Site.

Suitable habitat for the California Gnatcatcher (federally listed species) occurs at the Site pursuant to previous consultations between the Cleveland National Forest and the Carlsbad Office of the U.S. Fish and Wildlife Service. Santa Ysabel Creek has been designated a critical habitat for the federally listed endangered arroyo toad. Within a 4-mile radius there is critical habitat for several other federally listed endangered, threatened, or sensitive species.

## C.  Operational History

The former Ramona Burn Dump was operated by the County of San Diego (County) for the disposal of trash and rubbish from the community of Ramona and surrounding County areas from approximately 1948 to 1969. The Site was operated under a series of special use permits issued by the Forest Service. The initial permit was issued in 1947 and the last permit was terminated in 1974. The County operated the Site as a part of its burn dump operation located on adjacent private lands. Under the terms of the special use permit, the county was to confine the dumping to constructed pits within the permit area and ashes were to be placed in a separate pit. When the special use permit was terminated on February 2, 1974, waste disposal at the site ceased and the Site was covered by layer of soil. Over the years, in many areas, the soil cover has eroded exposing burn ash and waste debris.

The Site was uncovered following the Witch Creek fire in November 2007, when vegetation in the area was burned off and revealed that the cover material had eroded and exposed burn ash and waste debris at the site. The exposed burn dump area included remnants of a fire pit located on adjacent lands that are now owned and operated as Ramona Landfill by Allied

Waste, as well as historic burn ash and waste debris in the area identified as the Ramona Burn Dump Site on National Forest System lands.

The PA/SI (ERRG, 2010) noted that exposed ash and waste was observed over the entire site area, approximately 2.47 acres.  The EE/CA revised the size of the site to 3.5 acres after the site was mapped in 2013 using a global positioning system (GPS) to determine the lateral extent of waste and burn ash.   The ash and waste varies from 1 foot to 11 foot deep, with the thickest portions corresponding to what appeared to be two large north-south trending trenches based on historical aerial photographs. Soil cover was less than 1 foot thick over most of the site and several erosional gullies were observed and debris was found in the aforementioned drainages.

### D.  Release or Threatened Release into the Environment of a Hazardous Substance, or Pollutant or Contaminant

The primary sources of contamination at the Site are waste debris and ash from the burn dump operated by San Diego County from July 1948 through September 30, 1969.

The contaminants of concern - antimony, arsenic, barium, cadmium, chromium, cobalt, copper, lead, nickel, selenium, and zinc (heavy metals) and dioxins and furans - are potential hazardous substances or pollutants or contaminants as defined by Sections 101(14) and 101(33) of the Comprehensive Environmental Response, Compensation, and Liability Act, (CERCLA) as amended, 42 U.S.C. Section 9601(14) and (33).

The USFS completed a Preliminary Assessment/Site Inspection (PA/SI) in 2010 and an Engineering Evaluation/Cost Analysis (EE/CA) in 2014, which characterized the burn site related impacts. Figure 3 shows the location of surface debris and ash found during the site investigations. The data collected from the soils at the Site for the Chemicals of Potential Concern (COPC), heavy metal and dioxin and furan concentrations, compared against the soil cleanup levels the Forest Service developed for the Site are presented in Table 1 below.

**TABLE 1:  SUMMARY OF COPC CONCENTRATIONS IN SOILS
COMPARED TO CLEANUP LEVELS**

| COPC | Soil Clean- up Level (mg/kg) | | Soil Concentration (mg/kg) | |
|---|---|---|---|---|
| | Eco-SSL | Human Health RSL | | |
| | | | Min | Max |
| Antimony | **0.27** | 41 | ND | 7.8 |
| Arsenic* | 18 | **2.4** | ND | 59.5 |
| Barium** | **390** | 190,000 | 85 | 580 |
| Cadmium | **0.36** | 800 | ND | 8.3 |
| Chromium** | **42** | 1,500,000 | 7.6 | 110 |
| Cobalt** | **22.8** | 30 | 6.6 | 39 |
| Copper** | **111** | 41,000 | 27 | 870 |
| Lead | **11** | 800 | ND | 2300 |
| Nickel | **38** | 10,000 | 2.4 | 130 |
| Selenium | **0.52** | 5,100 | ND | 352 |
| Zinc** | **51** | 310,000 | 23 | 6400 |
| TCDD TEQ** | **0.199** | 18 | 0.29 | 1904 |

**Notes:**

**Bold -** Soil Clean-up Levels are the values that will be used to meet the objectives of this removal action.

* Arsenic - The cleanup level is based on the more stringent human health screening criteria for arsenic (EPA Industrial Screening Levels). All of the other heavy metal COPC's have ecological screening levels (Eco-SSLs) as the more stringent cleanup level (Eco-SSLs in the table are the most stringent value of plants, soil invertebrates, and avian and mammalian wildlife values).

**Background concentration was used as cleanup levels when 3 times the lowest background concentration was a higher concentration than the most stringent of the Eco-SSL or the Human Health RSL.

***TCDD TEQ - Dioxin and furans are expressed as the 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD) toxic equivalent quotient (TEQ). (Eco-SSL for mammals was most stringent).

An approximate area of 3.5 acres and an approximate volume of 28,967 cubic yards of contaminated soil above regulatory clean-up levels were estimated to be present at the Site. Figure 4 shows the approximate extent of waste and estimated depths of waste used for the volume estimate.

E. **NPL Status**

The Ramona Burn Site is not listed on the National Priorities List nor has the Site been proposed for the NPL.

F. **Maps, Pictures, and Other Graphic Representations**

Figure 1: Site Location Map
Figure 2: Site Features Map
Figure 3: Sample Locations and Screening Results
Figure 4: Waste Extent and Volumes

G. **Other Actions to Date**

Pursuant to the authority found at 42 U.S.C. Section 9604(a) and in Executive Order 12580, the Forest Service has initiated actions to respond to the above-mentioned release of hazardous substances.  The Forest Service has implemented a response in accordance with the NCP non-time-critical removal process, which has included the following:

- *Preliminary Assessment/Site Investigation for Ramona Burn Dump Site, Cleveland National Forest San Diego County, California*, completed in May, 2010 by Engineering/Remediation Resources Group, Inc.
- *Engineering Evaluation/Cost Analysis for the Non-Time-Critical Removal Action Ramona Burn Dump Site, Cleveland National Forest, California*, completed in January, 2014 by Engineering/Remediation Resources Group, Inc.

H. **State and Local Authorities Role**

This AM will be provided as formal notification to State and Local authorities who otherwise do not, at this time, have an active role in the response actions for the Site. Appropriate County Officials have been kept apprised of Forest plans for the Site through Status Memos and official correspondence.

The Forest Service is conducting response actions at the Site pursuant to its lead agency authority under CERCLA and Executive Order 12580.  Pursuant to 42 U.S.C. Section 9621(e) and 40 C.F.R. Section 300.400(e), no Federal, State or local permits are required for the on-site portion of this removal action.

III. **THREATS TO PUBLIC HEALTH OR WELFARE OR THE ENVIRONMENT, AND STATUTORY AND REGULATORY AUTHORITIES**

A. **Threats to Public Health, or Welfare or the Environment**

The release of hazardous substances from erosional features and drainage emanating from the Site supports the determination that it poses threats to public health, welfare and the environment and that it is appropriate to implement the response actions described in this AM.   In accordance with Title 40 Code of Federal Regulations, Part 300, Section 415 (40 C.F.R. Section 300.415), the following conditions indicate that removal action is warranted for the Site:

**i.   Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby human populations, animals, or the food chain;**

1.   Public Health and Welfare: The concentration levels of arsenic, cobalt, lead, and dioxins and furans above human health clean-up levels in near surface soils found at the Site indicate that the air and soil (inhalation and ingestion) human exposure pathways are complete. The Site is easily accessible by 2 wheel drive vehicles and has the potential to be used by recreational users visiting the Forest and by Forest Service staff and the adjacent landfill employees. Studies have identified the following health effects of exposure to arsenic, cobalt, lead, and dioxin and furans:
     a.   Arsenic: Gastrointestinal irritation, neuropathy, skin lesions, vascular disease, and death due to cardiopulmonary collapse (acute dose).
     b.   Cobalt: Asthma, pneumonia, skin rashes, nausea, and death due to cardiopulmonary collapse (acute dose).
     c.   Lead: Neurological and central nervous system effects and hematological and kidney effects (with higher susceptibility in children).
     d.   Dioxins and Furans: Highly toxic and can cause cancer, reproductive and developmental problems, damage to the immune system, and can interfere with hormones.

2.   Threats to the Environment: Ecological receptors could become exposed to site contaminants through direct contact with waste debris and burn ash contaminated soils; ingestion of waste debris and burn ash- contaminated soils; and ingestion of contaminated food (e.g., soil-dwelling insects, vegetation).

**ii.   Actual or potential contamination of drinking water supplies or sensitive ecosystems;**

Waste debris have been identified in the two natural drainages flanking the Site and extending down the drainage beyond the Forest Boundary. The two natural drainages merge east of the Site. Downstream of the Site the drainage becomes an unnamed ephemeral creek that joins Santa Ysabel Creek within 0.5 miles of the Site. Surface waters within the Santa Ysabel Creek area have been designated for municipal and domestic water supply beneficial use. Santa Ysabel Creek has been designated as critical habitat for the federally listed endangered arroyo toad. Thus there is the

potential for contamination of drinking water supplies or sensitive ecosystems if the contamination continues to migrate to Santa Ysabel Creek.

iii. **High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface that may migrate;**

1. Human Health and Welfare: Elevated concentrations of arsenic, cobalt, lead, and dioxins and furans in near surface soils in waste debris and burn ash-contaminated soils that exceed human health screening level thresholds are present in exposed un-vegetated soils at the Site. These contaminated soils are susceptible to migration because of water- and wind-borne influences. Evidence of migration of these waste debris into adjacent drainage areas downstream of the Forest boundary has been documented based on visual inspections.

2. Threats to the Environment: Elevated concentrations of antimony, arsenic, barium, cadmium, chromium, cobalt, copper, lead, nickel, selenium, zinc, dioxin and furans in the waste debris and burn ash-contaminated soils that exceed ecological soil screening levels are present in exposed un-vegetated soils at the Site. These contaminated soils are susceptible to migration because of water- and wind-borne influences. Evidence of migration of these waste debris into adjacent drainage areas downstream of the Forest boundary has been documented based on visual inspections.

iv. **Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;**

Waste debris and burn ash contaminants are present in un-vegetated soils at the Site and exposed to the elements. The Site drains to a tributary of Santa Ysabel Creek. Rainfall or other forms of run-off inducing events will tend to spread the contaminated materials further from the site.

B. **Availability of Other Appropriate Federal or State Response Mechanisms to Respond to the Release**

The Site is located on National Forest System lands under the jurisdiction, custody and control of the U.S. Forest Service, within the boundaries of the Cleveland National Forest. No other federal or state response mechanisms are available to respond to the release.

IV. **ENDANGERMENT DETERMINATION**

Actual or threatened releases of hazardous substances, pollutants and contaminants from the Site, if not addressed by implementing the response actions selected in this AM, may continue to present an imminent and substantial endangerment to public health, welfare, or the environment.

## V.   PROPOSED ACTIONS AND ESTIMATED COST

### A.  Proposed Actions

The proposed actions are integral to a comprehensive effort to address waste debris and burn ash-related human health and environmental impacts in the San Dieguito Watershed. The following objectives, which correspond to Section 300.415(b)(2) of the NCP, have been developed for the site:

- Reduce exposure of humans and wildlife to metals and dioxins and furans in soil and burn ash to acceptable levels.
- Reduce the risk of erosion of contaminated soil and burn ash.

Based on an analysis of the nature and extent of waste debris and burn ash impacted soils and the response objectives listed in the preceding paragraph, the following three alternative actions were evaluated for the Ramona Burn Dump Site:

*Alternative 1* - No Action

*Alternative 2* - Cap Contaminated Soil and Burn Ash in Place involves capping contaminated soil and burn ash in situ (approximately 3.5 acres), with minimal consolidation and relocation of the waste at the site the cap would cover an area of approximately 3.3 acres. Only Area 10 (shown on Figure 4) would be excavated to a depth of 0.5 foot bgs and placed on top of the main body of the waste. Area 10 is estimated to contain approximately 429 cubic yards of waste material that would require consolidation.  A soil cap consisting of at least 2 feet of clean soil, a demarcation layer, and an impermeable 40-mil high-density polyethylene (HDPE) liner with appropriate drainage features[1] would be constructed on top of the entire waste footprint (Figure 4).

*Alternative 3* - Consolidate and Cap Contaminated Soil and Burn Ash in Place (Proposed) similar to Alterative 2 in construction and implementation but differs in that contaminated soil and burn ash would be consolidated into a single, and smaller, waste disposal unit prior to being caped in place.  Under Alternative 3, approximately 1,536 cubic yards of waste material and contaminated soil would be consolidated into a single waste repository and placed under an approximate 2.6 acre RCRA-compliant cover system. The cover system will be similar to that in Alternative 2 and will consist of a soil cap of at least 2 feet of clean soil, a demarcation layer, and an impermeable 40-mil high-density polyethylene (HDPE) liner with appropriate drainage features constructed on top of the entire waste footprint (Figure 4).

*Alternative 4* - Excavation and Offsite Disposal of Contaminated Soil and Burn Ash, all contaminated soil and burn ash would be removed from the site for transportation to an offsite disposal facility.  In total, approximately 28,967 bank cubic yards of contaminated soil and burn ash would be disposed of off-site.  The contaminated soil and burn ash

---

[1] The liner system design allows for drainage along the micro spikes in the geotextile.

would be hauled on Pamo Road and then to an appropriately-licensed disposal facility such as South Yuma County Landfill in Yuma, Arizona. Excavated areas would be backfilled with clean soil, and the site would be restored to its original grade.

Alterative 1 was not selected because it would not address the actual or potential imminent and substantial human health and ecological threats posed by the exposed waste debris, burn ash, and burn ash-contaminated soils. Alternatives 2 and 4 were not selected even though they meet all of the removal action objectives and complied with all of the Applicable or Relevant and Appropriate Requirements (ARARs) but are not as cost effective as Alterative 3.

i.   **Description of Proposed Alternative**

**<u>Alternative 3 – Consolidate and Cap Contaminated Soil and Burn Ash in Place (Proposed)</u>**

The proposed Alternative will consolidate approximately 1,536 cubic yards of waste and contaminated soils from Areas 1 through 10, placed on top of Areas 1 through 5 and 7 through 9, and placed under a compliant solid waste disposal site cover system (Figure 4). The reduced size of the cover system is anticipated to cover approximately 2.6 acres.

This alternative would require an engineering study and design to establish site requirements for the cap, confirm the depth to groundwater beneath the site, and to ensure that all appropriate requirements are met. Engineering controls such as grading, drainage ditches, and culverts would be used where needed to divert water away from the cap and ensure that the repository is not impacted by drainage across the site.

Measures would be implemented to minimize the short-term impacts to unnamed ephemeral creeks on site. Construction activities would be conducted during the dry season, and BMPs would be implemented such that short-term impacts to humans (including site construction workers) and the environment would be minimized.

The soil is classified as California hazardous waste but not RCRA hazardous waste in accordance with Title 22 CCR § 66261 and Title 40 Code of Federal Regulations (CFR) §261.24. Other federal or state requirements for appropriate siting, construction, and long-term inspection and maintenance may apply, however [e.g., regulations for corrective action management units at Title 40 C.F.R. Part 264, Subpart S, and Part 264.552(c)].

ii.   **Contribution to Long Term Performance**

The proposed Alterative would minimize the potential for exposure to metals and dioxins and furans present at the site and would prevent exposure or continued

erosion of waste materials from the site, thereby minimizing the potential for future or continued downstream releases. Appropriately designed and maintained surface water drainage and vegetative maintenance would limit future erosion of the cover materials and reduce the potential for future releases. The HDPE liner would prevent surface water infiltration through waste materials and minimize the potential for leachate development. Future institutional controls, such as placing fences or signs around the cap to reduce the potential for erosion of the cap by site visitors and ensure that permanent vegetation is established, may be required in the engineering design. This alternative would require long-term operation and maintenance (O&M) of the cover to ensure that no release of contaminants occur in the future. An impermeable cap is considered effective at addressing the risks posed to human health and the environment by contaminated soil and burn ash. Contaminated materials would be encapsulated such that exposure of humans or wildlife to waste would be reduced. This alternative would comply with all chemical-, location-, and action-specific ARARs.

iii.    **Engineering Evaluation/Cost Analysis (EE/CA)**

In 2010, the Forest Service completed a site investigation to characterize the waste debris and burn ash impacted soils located within the Ramona Burn Dump located on National Forest System lands. The results of the investigation are presented in the report titled *Final Preliminary Assessment/Site Inspection Report for the Ramona Burn Dump Site Cleveland National Forest, San Diego County, California. May, 2010.* Based on this assessment, the Forest Service conducted an EE/CA.

The analytical data found in the 2010 PA/SI and additional data and components of the identification and analysis of the removal action alternatives found in the report titled *Engineering Evaluation/Cost Analysis for the Non-Time-Critical Removal Action Ramona Burn Dump Site Cleveland National Forest, California January, 2014,* were used to support preparation of this action memorandum.

The EE/CA and administrative record were made available for the required 30-day public comment period per the NCP.

iv.    **Applicable or Relevant and Appropriate Requirements (ARARs)**

ARARs include "applicable" or "relevant and appropriate" requirements.

**Applicable Requirements:**  Applicable requirements are those cleanup standards, standards of control, and other substantive requirements, criteria, or limitations promulgated under Federal or State environmental or facility siting laws that specifically address a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance found at a CERCLA site.  "Applicability" implies that the remedial action or the circumstances at the site satisfy all of the jurisdictional prerequisites of a requirement.

**Relevant and Appropriate Requirements**: Relevant and appropriate requirements are those cleanup standards, standards of control, and other substantive environmental protection requirements, criteria, or limitations promulgated under Federal environmental or State environmental or facility siting laws that, while not "applicable" to a hazardous substance, pollutant, contaminant, remedial action, location, or other circumstance at a CERCLA site, address problems or situations sufficiently similar to those encountered at the CERCLA site that their use is well suited to the particular site.

The proposed action may attain ARARs under federal or state environmental or facility siting laws. Other federal and state advisories, criteria or guidance may, as appropriate, be considered in formulating the removal action. The recommended non-time-critical removal action will comply with the following ARARs to the extent practicable, considering the exigencies of the situation:

**Action-Specific ARARs for this response action are:**

- **Resource Conservation and Recovery Act, 42 U.S.C. Sections 6901-6991.** This requirement defines RCRA hazardous waste, requirements for on-site generation of waste.

- **Clean Water Act Section 404, 40 C.F.R. Part 230, 33 C.F.R. Parts 320-330, 40 C.F.R. Part 6, Appendix J.** Regulations to protect waters of the U.S. and wetlands, as defined by EPA and the U.S. Army Corps of Engineers regulations, by prohibiting the discharge of dredged or fill material without a permit, and taking actions to avoid adverse effects, minimize potential harm and preserve and enhance wetlands to the extent practicable.

- **Federal Noxious Weed Act, 7 U.S.C. Section 2801 *et seq*.** Requires efforts to avoid the introduction and spread of identified noxious weeds.

- **California Hazardous Waste Control Law and Hazardous Waste Disposal Regulations; Title 22, CCR 66262.1 to 66263.32 *et seq*.** Requirements for determination of non-RCRA hazardous wastes, non-hazardous waste, and hazardous waste management, including manifesting, record keeping, storage, and packaging procedures for hazardous waste.

- **California Environmental Protection; Title 27, CCR 21090, 20310, 20320, 21142, 21145, and 21150 *et seq*.** Requirements for construction and containment of onsite encapsulation of waste material.

- **Air District Regulations (nuisance and fugitive dust control)**

  **Rule 402 - Nuisance**
  **Rule 403 - Fugitive Dust**

<u>Potential Chemical-Specific ARARs for this response action are:</u>

- **EPA Regional Screening Levels.** Provides non-regulatory screening criteria for the protection of human health.

- **EPA Ecological Soil Screening Levels.** Provides non-regulatory screening criteria for the protection of ecological receptors.

<u>Location-Specific ARARs for this response action are:</u>

- **Archeological and Historic Preservation Act, 16 U.S.C. Section 469, 40 C.F.R. 6.301.** Establishes procedures to preserve historical and archeological data that might be destroyed through alteration of terrain as a result of a federal undertaking.

- **Archeological Resources Protection Act of 1979, as amended, 16 U.S.C. Sections 470aa-470mm.** Prohibits unauthorized excavation, removal, damage, alteration or defacement of archeological resources located on public lands.

- **Endangered Species Act, 16 U.S.C. Section 1531 *et seq*.** Defines and provides a means for conserving various species of fish, wildlife, and plants that may be threatened with extinction, and provides for the designation of critical habitats essential to the conservation of a threatened or endangered species. Requires Federal agencies, in consultation with DOI and the National Marine Fisheries Service, to ensure that actions that they authorize, fund or carry out are not likely to jeopardize the continued existence of threatened or endangered species or adversely modify or destroy their critical habitat.

## B.  <u>Project Schedule</u>

The proposed actions are expected to begin in March 2018 and be completed by November 1, 2018.

## C.  <u>Estimated Costs</u>

The estimated costs represent an order-of-magnitude estimate with and intended accuracy of +50 to -30 percent accuracy. A summary of cost from the January 2014 EE/CA is listed below:

| | |
|---|---|
| Capital Cost: Estimated cost for design and implementation: | $1,662,276 |
| Recurring O&M cost for years 1-30 present value: | $ 643,991 |
| Periodic Cost for repairs years 1-30 present value: | $ 359,365 |
| Forest Service Oversight for design and implementation: | <u>$   14,821</u> |
| **Total in January 2014 dollars** | **$2,680,453** |
| **Total in 2017 dollars (i=0.25%, n=3.5 years)** | **$2,703,980** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## VI.    EXPECTED CHANGE IN THE SITUATION SHOULD ACTION BE DELAYED OR NOT TAKEN

If the response action should be delayed or not taken:
- Hazardous substances will remain as potential human health and ecological threats based on inhalation, ingestion, and dermal contact exposure pathways; and
- Hazardous substances will remain a continuing source of soil contamination.

## VII.    OUTSTANDING POLICY ISSUES

None have been identified at this time.

## VIII.    ENFORCEMENT

The Forest Service's research and follow-up research by the Office of the General Counsel (OGC) resulted in the determination of a viable Potential Responsible Party (PRP). An Administrative Settlement Agreement and Order on Consent will be sent to the viable PRP.

## IX.    DECISION

The Forest Service has CERCLA authority and is the "lead agency" for National Forest System (NFS) lands at non-National Priorities List sites.  No other appropriate response mechanisms or authorities are currently available to address this Site.

In compliance with the Forest Service's role in protecting the public health and welfare and the environment, and because the release or threatened releases are on NFS lands under the administration of the Cleveland National Forest, and pursuant to the authority found at 42 U.S.C. Section 5604 (a), Executive Order 12580, and 7 C.F.R. 2.60, the Forest Service undertakes this response action.  The response action will be not inconsistent with the NCP.

Approval is hereby given by the Forest Service to conduct a non-time-critical removal action to consolidate and cap in place contaminated soil and burn ash from the Ramona Burn Dump Site on the Cleveland National Forest.

The removal action for the Site was developed in accordance with CERCLA, as amended, and is not inconsistent with the NCP.  Conditions at the site meet the NCP 40 C.F.R. § 300.415(b) criteria for a removal action. This decision is based upon information contained within the Site's administrative record.

Signature: _____    Date: August 17, 2017

Tyrone Kelley
Director of Engineering
Pacific Southwest Region

# References

County, 2010b.  "County of San Diego General Plan Update, Ramona Community Plan."  April 2.
        Available Online at:
            <http://www.sdcounty.ca.gov/dplu/gpupdate/docs/draftgp/complan/ramona_070109.pdf>.

Engineering/Remediation Resources Group, Inc. (ERRG), 2010.  "Final Preliminary Assessment/Site
        Inspection for the Ramona Burn Dump Site, Cleveland National Forest, San Diego County,
        California."  May 2010.

Forest Service, 2013.  "Cleveland National Forest."  Available Online at:
        <http://www.fs.usda.gov/cleveland>.  Accessed October 30.

San Diego Regional Water Quality Control Board, 2011.  "Water Quality Control Plan for the San Diego
        Basin."  April 4.  Available Online at:
            <http://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/>.

U.S. Census Bureau, 2013.  "U.S. Census Bureau QuickFacts, Ramona (city)."  Available Online at:
        <http://quickfacts.census.gov/qfd/states/06/0659346.html>.  Last revised June 27, 2013.

# Figures



LEGEND:

≡ CULVERT

⋯ DRAINAGE (NO DEBRIS AND/OR ASH OBSERVED)

⋯ DRAINAGE WITH DEBRIS AND/OR ASH OBSERVED

⋯ FORMER DRAINAGE WITH DEBRIS AND/OR ASH

▬ APPROXIMATE SANDBAG LOCATION

▓ AREAS OF CONCENTRATED SURFACE DEBRIS

▢ APPROXIMATE WASTE FOOTPRINT

⇨ DIRECTION OF SURFACE WATER FLOW

☐ APPROXIMATE EXTENT OF SCATTERED SURFACE DEBRIS / REDUCED VEGETATION

▬ BERM

━ ━ FOREST SERVICE PROPERTY BOUNDARY

═ ROAD

━ ━ FORMER ROAD (APPROXIMATE)

━━ FENCE

⌐ ELEVATION CONTOUR (20-FOOT INTERVAL)

SCALE: 1" = 80 FEET

DUMP ROAD

NEWLY INSTALLED CULVERT

SITE FEATURES MAP

U.S. DEPARTMENT OF AGRICULTURE FOREST SERVICE

RAMONA BURN DUMP SITE
CLEVELAND NATIONAL FOREST
RAMONA, CALIFORNIA

Engineering/Remediation
Resources Group, Inc.

ERRG



*United States v. County of San Diego* - Case 3:22-cv-01753-JO-NLS

## Consent Decree - Appendix B

**Statement of Work**

**for the Non-Time Critical Removal Action at the Ramona Burn Dump Site**

**Cleveland National Forest, USDA Forest Service**

**TABLE OF CONTENTS**

1.    PURPOSE ...................................................................................................................2

2.    EXISTING SITE DATA ............................................................................................3

3.    DELIVERABLES ......................................................................................................3

4.    REMOVAL ACTION TASKS ..................................................................................4

5.    EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES............................9

6.    PROJECT PLAN COORDINATION AND COMMUNITY INVOLVEMENT ............10

7.    SCHEDULE ...............................................................................................................10

# 1.     PURPOSE

1.1     The purpose of this Statement of Work ("SOW") is to implement the Consent Decree ("Decree") and the Ramona Burn Dump Removal Action, as required thereby, detailed in the 2022 Ramona Burn Dump Unilateral Administrative Order ("UAO").  The work performed in accordance with the SOW will consolidate all burn ash material from the Ramona Burn Dump and cap it in place, and will, consistent with the manner set forth herein and in the August 2017 "Non-Time Critical Removal Action Memorandum" ("AM"):

    (a)     Mitigate exposure of humans and wildlife to metals, dioxins and furans in soil and reduce burn ash to established EPA Industrial, BLM Recreational Human Health, and EPA Ecological Soil Screening Levels.

    (b)     Minimize the risk of erosion of contaminated soil and burn ash, through the provision of a protective soil cap cover and long-term Operation and Maintenance.

1.2     The Ramona Burn Dump Non-Time Critical Removal Action is designed to protect human health and the environment based on current nonresidential and recreational uses of the site.

1.3     Work performed in accordance with this SOW shall be consistent with the requirements of the AM, including Applicable or Relevant and Appropriate Requirements ("ARARs"), the latest version of pertinent codes, standards and performance standards.

1.4     Permits

    (a)     As provided in CERCLA § 121(e), no permit is required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work).  Where any portion of the Work that is not on-site requires a federal or state permit or approval, Settling Defendant shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

    (b)     Settling Defendant may seek relief under the provisions of Section IX (Force Majeure) of the Decree for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in Paragraph 1.4(a) and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

    (c)     Nothing in the Settlement constitutes a permit issued under any federal or state statute or regulation.

1.5     The Work to be completed under this SOW shall include, as set forth in Section 4 below, the following Tasks:

2

      (a)      Task 1:  Removal Action Work Plan Preparation and Delivery (draft and final);

      (b)      Task 2:  Removal Action Implementation;

      (c)      Task 3:  Removal Action Completion/After Action Report and Delivery;

      (d)      Task 4:  Post Removal Action Completion Operation and Maintenance;

      (e)      Task 5:  Project Plan Coordination and Community Involvement.

**1.6**    Removal activities shall be completed in accordance with this SOW, the AM, the UAO, and the approved Work Plan.

## 2.      EXISTING SITE DATA

**2.1**    The following information is available to Settling Defendant or their Representatives and will be provided upon request:

      (a)      *Preliminary Assessment/Site Inspection Report for the Ramona Burn Dump Site, Cleveland National Forest, San Diego County, California*.  May 2017.  Engineering/Remediation Resources Group, Inc.

      (b)      *Engineering Evaluation/Cost Analysis (EE/CA) for the Non-Time-Critical Removal Action, Ramona Burn Dump Site Cleveland National Forest, California*.  January 2014.  Engineering/Remediation Resources Group, Inc.

      (c)      *Removal Action Memorandum, Non-Time Critical Removal Action, Ramona Burn Dump Site, Cleveland National Forest*.  August 17, 2017.

      (d)      *Cleveland National Forest Fire Plan*.

## 3.      DELIVERABLES

**3.1**    Settling Defendant shall submit plans, specifications, and other deliverables for Forest Service review and approval, as specified below.  Submit draft documents in electronic format (both Word and pdf) for Forest Service review.  Provide a cumulative response to comments with subsequent submittals.  Final documents shall be prepared after Forest Service approval of document.  One copy of each final written deliverable shall be provided in an unbound hard copy format suitable for reproduction; two additional hard copies and electronic copies shall also be provided.  Information presented in color must be legible and interpretable when reproduced in black and white.  Draft and final written deliverables shall also be provided in electronic format as MS Word, MS Excel, and Adobe PDF documents.

**3.2**    Settling Defendant shall implement quality control procedures to ensure the quality of all reports and submittals to the Forest Service.  These procedures shall include, but are not limited to the following:  internal technical and editorial review; independent verification

of calculations; and documentation of all reviews, problems identified, and corrective actions taken.

3.3    After review of the Removal Work Plan and any other deliverable required to be submitted for Forest Service approval under the Settlement, the Forest Service shall either: (i) approve, in whole or in part, the deliverable; (ii) approve the submission upon specified conditions or required revisions to the deliverable; (iii) disapprove, in whole or in part, the deliverable; or (iv) any combination of the foregoing.  If the Forest Service requires revisions, the Forest Service will provide a deadline for the resubmission, and Settling Defendant shall submit the revised deliverable by the required deadline.  Once approved or approved with conditions or required revisions, Settling Defendant shall implement the Removal Work Plan or other deliverable in accordance with the Forest Service-approved schedule.  Upon approval, or subsequent modification, by the Forest Service of any deliverable, or any portion thereof: (1) such deliverable, or portion thereof, and any subsequent modifications, will be incorporated into and enforceable under the Decree; and (2) Settling Defendant shall take any action required by such deliverable, or portion thereof.  Settling Defendant shall not commence or perform any Work except in conformance with the terms of the Decree.

3.4    As described in Paragraph 3.3, the Forest Service may approve, disapprove, or modify each deliverable.  All deliverables required under the Decree and SOW shall contain the following statement, signed by the Settling Defendant's Project Manager:

"I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## 4.    REMOVAL ACTION TASKS

4.1    **Removal Action Work Plan Preparation and Delivery (draft and final).**  Settling Defendant shall prepare a Removal Action Work Plan (Work Plan) in accordance with the schedule in Section 7 of this SOW for Forest Service review and approval.  The Removal Action Work Plan shall describe Settling Defendant's plan for implementation of the site response action within the terms and conditions of this SOW, the Decree, and the Ramona Burn Dump Site AM. The Work Plan shall include, but is not limited to, the following elements:

    (a)    Health and safety plan, quality assurance plan, and sampling plan.  Quality assurance, sampling, and data analysis shall include a quality assurance project plan and a field sampling plan that address sampling and analysis required to guide and confirm removal activities.

4

(b)     General description of proposed removal and other actions to be performed.

(c)     Description of specific design tasks including staging areas, storage and use areas of equipment (including spill prevention and response for fueling and maintenance), non-contaminated materials, contaminated materials and how they will be handled and protected and the handling and protection of burned debris and ash.  This item includes furnishing maps with all pertinent construction areas shown and drawings with existing topographic contours and planned topographic contours following implementation shown.

(d)     Proposed schedule for implementation of all proposed activities and deliverables.

(e)     Identification and description of the duties, responsibilities, authorities, and qualifications of the personnel involved in design and implementation of the removal measures.

(f)     Description of the selected removal action and action levels in accordance with the Non-Time Critical Removal AM.

(g)     Identification and description of design criteria and performance standards that shall be applied to the removal activities to be conducted by Settling Defendant.

(h)     Design plan submittal.

(i)     Identification and listing of federal, state, or local laws, regulations, or guidance applicable to or associated with the removal action and an explanation of how they will be incorporated into the implementation of the removal action.

(j)     Description of how removal action activities at the Site will comply with the substantive requirements of the National Historic Preservation Act.

(k)     Description of how vegetation and tree removal will be accomplished in accordance with Forest Service Regulations.

(l)     Description of institutional controls and site access restrictions to be imposed during and/or after removal action activities and how they will be implemented and maintained.

(m)     Description of construction methods and handling of cover materials on-site.

(n)     Description of construction equipment and materials.

(o)     Description of imported earth materials and conformance to Forest Service weed free requirements.

(p)     Site Management Plan ("SMP") that provides the Forest Service with a written understanding of how access, security, contingency procedures, management responsibilities and field generated waste disposal are to be handled.

(q)    Description of how all work shall be done in conformance to Cleveland National Forest Fire Plan.

(r)    Noise Control and Abatement Plan.

(s)    Dust Abatement Plan.

(t)    Site Restoration Plan including re-vegetation with Forest Service-approved native seed mix.

(u)    Operation, Maintenance and Monitoring Plan of Remedy.

(v)    Operation and Maintenance Plan.

**4.2    Removal Action Implementation.**  Settling Defendant shall perform all work efforts related to the construction and implementation of the removal action remedy by the Contractor(s) at the site in accordance with the Decree, this SOW, and the approved Removal Action Work Plan.  Work activities under this task include, but are not limited to:

(a)    Implementation of temporary site access restrictions.

(b)    Securing site and establishing operations area, including laying out of clean zone, waste/stage handling areas and decontamination areas.

(c)    Implementation of the remedy in accordance with the design plans and specifications.

    (1)    Maintain field logs and daily diaries.

    (2)    Monitor, update, and report construction progress.

    (3)    Conduct field and confirmation sampling and analysis.

(d)    Oversight of contractors performing site work.

    (1)    Conduct/attend progress meetings.

    (2)    Check construction drawings submitted by construction subcontractors for compliance with design and construction plans and specifications.

(e)    Perform field testing, recommend action on health and safety considerations (*e.g.*, site safety plan), and monitor quality control procedures.

(f)    Quality assurance monitoring.

(g)    Preparation of documents for community involvement activities, if deemed appropriate.

(h)     Removal of site security and temporary access restriction measures.

(i)     Site restoration.

**4.3     Removal Action Completion**

(a)     **Removal Action Completion Site Inspection**

    (1)     Within 30 days after Settling Defendant believes that the Removal Action (A) has been fully performed and (B) achieved the removal action goals and objectives set forth in the Action Memorandum and the Decree, the Settling Defendant shall notify the Forest Service and shall schedule and conduct a Removal Action Completion site inspection.  The inspection shall be attended by Settling Defendant's project manager, its contractor(s), and the Forest Service.

    (2)     The objective of the inspection(s) is to determine whether the removal action was fully performed and that site restoration efforts have been completed.  Any outstanding items and deficiencies discovered during the Removal Action Completion site inspection shall be identified and noted on a bullet list and corrected by Settling Defendant within 30 days.

(b)     **Removal Action Completion Report**.  In accordance with Section XVI of the Decree, Settling Defendant shall submit a Removal Action Completion Report to the Forest Service for review and approval.  The report shall conform, at a minimum, with the requirements set forth in the EPA guidance document entitled: "Superfund Removal Procedures: Removal Response Reporting – POLREPS and OSC Reports" (OSWER Directive No. 9360.3-03, June 1, 1994).  In addition to the items listed in the Decree, this report shall contain, but is not limited to:

    (1)     Results of the Removal Action Completion site inspection, including a brief description of any problems discovered during the inspection and the resolution of those problems, as necessary.

    (2)     A detailed description of all work conducted in accordance with the approved final Removal Action Work Plans and specifications, and certification by Settling Defendant's Project Manager that the work was performed in accordance with all approved plans and specifications.

    (3)     Results of confirmation sampling, including all raw data and data validation.

    (4)     Discussion of any variance from the Sampling and Analysis Plan ("SAP"). Evaluation of the sampling results.

    (5)     Certification that the required removal action criteria have been achieved.

(6)   A listing of quantities and types of materials removed off-Site from each contaminated area.

(7)   Accompanying appendices containing all weekly status updates, monthly reports, and community involvement activities documents prepared during the course of the removal action.

(8)   Long-term monitoring and reporting ("Operation and Maintenance") plan, in accordance with the EE/CA selected Removal Action alternative and 40 C.F.R. § 300.415(e)(2).

(c)   **Notice of Completion of Work**

(1)   If after reviewing the Final Report under paragraph 4.3(b), the Forest Service determines that all Work, other than the continuing obligations specified in this Paragraph, has been fully performed in accordance with this Consent Decree, the Forest Service will provide notice to Settling Defendant.  Notice of completion of work does not affect the following continuing obligations:

(i)   Implementing and maintaining the requirements of the Operation and Maintenance Plan, as described in Section 4.4 below;

(ii)   Payment of Future Response Costs; and,

(iii)   Obligations under Consent Decree Section XV (Records).

(2)   If the Forest Service determines that any Work other than the continuing obligations has not been completed in accordance with this Settlement, the Forest Service will so notify Settling Defendant and provide a list of deficiencies to be corrected and a schedule for correcting them.  Settling Defendant shall promptly correct all identified deficiencies in accordance with the schedule provided and shall submit a modified Final Report following completion of such work.  Subsequent determinations by the Forest Service regarding completion of Work shall be handled in accordance with this Paragraph.

**4.4**   **Post Removal Action Completion/After Action Operation and Maintenance**

(a)   **Operation and Maintenance Plan Preparation and Submittal**:  In accordance with Section VI of the Decree, the Settling Defendant shall prepare a long-term Post Closure Operation and Maintenance ("O&M") Plan for the Ramona Burn Dump.  The Settling Defendant shall submit a Draft O&M Plan for Forest Service review and approval.  The O&M Plan shall incorporate all local, State and Federal regulations pertaining to Closed Disposal Sites, including California Code of Regulations Titles 27 and 14 and Public Resources Code Division 30.  The O&M Plan shall address all areas disturbed during implementation including, but not limited to the former waste disposal areas, the waste consolidated area and

unpaved travelled routes adjacent to the Site.  The O&M Plan shall include but not be limited to the following key aspects of the Site:  warning signage, soil erosion, rodent burrows on or near the cap, intact and functional erosion control and drainage diversion materials, any changes in the closure area contours such as depressions or slides, liner exposure or protrusions, and large tree growth (with deep tap roots) on the cap.

(b)     **Operation and Maintenance Implementation**.  In accordance with Section VI of the Decree, the Settling Defendant shall conduct O&M for the removal action. The Settling Defendant shall conduct all site inspections, perform all maintenance and repair activities, and document all operations, maintenance, and repairs in accordance with the approved long-term operation and maintenance plan for the duration of the life of the Closed Disposal Site while under USDA/FS ownership. Annual reports shall be submitted to the Forest Service documenting the findings of all site inspections, with summary of all maintenance and repair activities required to correct performance deficiencies, and photo documentation of before and after condition for all maintenance and repair activities.  The annual reports shall certify that work has been completed in full conformance with the Decree, SOW and approved O&M Plan.

## 5.     EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

5.1     If any event occurs during performance of the Work that causes or threatens to cause a release of Waste Material on, at, or from the Site and that either constitutes an emergency situation or that may present an immediate threat to public health or welfare or the environment, Settling Defendant shall: (a) immediately take all appropriate action to prevent, abate, or minimize such release or threat of release; (b) immediately notify the USDA/FS On-Scene Coordinator ("OSC"), identified in Paragraph 59 of the Consent Decree, of the incident or Site conditions; and (c) take such actions in consultation with the OSC or other authorized Forest Service officer and in accordance with all applicable provisions of this Consent Decree, including, the Health and Safety Plan, and any other applicable deliverable approved by the Forest Service.

5.2     Upon the occurrence of any event during performance of the Work that Settling Defendant is required to report under CERCLA § 103 or section 304 of the Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11004, Settling Defendant shall immediately orally notify the OSC and the National Response Center at (800) 424-8802.  Settling Defendant shall also submit a written report to the Forest Service within seven days after the onset of such event, describing (a) the event, and (b) all measures taken and to be taken: (i) to mitigate any release or threat of release; (ii) to mitigate any endangerment caused or threatened by the release; and (iii) to prevent the reoccurrence of any such a release or threat of release.  The reporting requirements under this Paragraph are in addition to the reporting required by CERCLA § 103 or EPCRA § 304.

6.  **PROJECT PLAN COORDINATION AND COMMUNITY INVOLVEMENT**

6.1  **Project Initiation Meeting and Site Visit**.  Settling Defendant will hold a project initiation meeting with the Forest Service within 20 days after the removal action consultant is hired.  The purpose of the project initiation meeting is to afford Settling Defendant and Settling Defendant's consultants/contractors an opportunity to review with the Forest Service the technical requirements of the Decree and this SOW and seek clarification regarding the performance of the required Work and/or preparation of deliverables, and to establish a date for a Site visit, if needed.  Settling Defendant will prepare a written summary of the content, key decisions, and action items of the meeting and distribute it to the meeting participants.  Any comments on the written summary provided by the Forest Service will be incorporated and redistributed to all parties.

6.2  **Weekly Status Updates**.  Settling Defendant will hold weekly status meetings or phone conferences with the Forest Service during implementation of response action field activities.  Settling Defendant will prepare a written summary of the content, key decisions, and action items of each meeting and distribute it to the meeting participants before or during the following meeting.  Any comments on the written summary provided by the Forest Service will be incorporated and redistributed to all parties.

6.3  **Monthly Progress Reports**.  Monthly progress reports shall be submitted to the Forest Service by the 15th day of the following month that describe all actions undertaken pursuant to the Decree and this SOW until the Forest Service issues the County written certification of the completion of work (as that certification is defined Section 4.3 of this SOW).  At a minimum, with respect to the preceding month, progress reports shall contain the following information regarding the preceding reporting period:  Actions which have been taken to comply with the Decree and this SOW during that month; Results of sampling and tests and all other data received by Settling Defendant; Work planned for the next two months with schedules relating such Work to the overall project schedule; Description of all problems encountered and any anticipated problems, any actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays.

6.4  **Community Involvement Activities, as needed.**  Settling Defendant will support the Forest Service's community involvement and information efforts to ensure that the public receives accurate and timely information regarding the Removal Action Implementation.  As requested by the Forest Service, Settling Defendant shall participate in the preparation of such information for dissemination to the public and in public meetings that may be held or sponsored by Forest Service to explain activities at or relating to the Site.

7.  **SCHEDULE**

7.1  The deliverables required by this SOW shall be submitted to the Forest Service in accordance with Section XVI of the Decree and the Approved Removal Action Work Plan.

| Task | Subtask | ¶ Ref | Deadline for Deliverable |
|---|---|---|---|
| Removal Action Work Plan | | | |
| | Hire Consultant to Prepare Work Plan | | 180 Days after Effective Date |
| | Submit Health & Safety Plan, QAPP & SAP, and Draft Work Plan | | 270 Days after Effective Date |
| | Revised Draft Work Plan | | 30 days after receipt of Forest Service ("FS") comments |
| Removal Action Implementation | | | |
| | Hire Contractor | | 180 days after FS Approval of Work Plan and Schedule |
| | Commence Implementation of Approved Work Plan and Project Schedule | | Within 30 days of hiring a contractor |
| Removal Action Completion | | | |
| | Schedule Removal Action Completion inspection | | 15 days after determining project is completed |
| | Submit Draft Removal Action Completion Report | | 45 days after completion of all Work |
| | Submit Revised Removal Action Completion Report | | 30 days after receipt of FS comments |
| Operations, Maintenance and Monitoring Plan | | | |
| | Submit Draft O&M Plan | | 90 days after completion of Work |
| | Submit Revised O&M Plan | | 30 days after receipt of FS comments |
| | Submit Annual Monitoring Reports | | In accordance with approved plan |
| Coordination and Communication Requirements | | | |
| | Initial Project Meeting | | 15 days after Removal Action Contractor hired |
| | Weekly Status Updates | | 1st day of week for the previous week |
| | Monthly Progress Reports | | 15th day of the following month |

| Deliverable | Number of Hard Copies |
|---|---|
| Draft/Final Project Work Plans: | 3 |
| Draft and Final Technical Memorandums (If Requested): | 3 |
| Draft/Final Reports: | 5 |

Provide the Forest Service with an electronic version of all reports in MS Word, MS Excel, AutoCAD and Adobe PDF format.